*943 OPINION OF THE COURT
Guy P. De Phillips, J.
By order to show cause dated and filed June 19, 1992, in this court (docket No. V4576/92) petitioner John Doe, the maternal grandfather of Amy Smith born October 31, 1991 to respondents Lisa and A1 Smith, seeks visitation with his grandchild. By order to show cause dated June 4, 1992 filed in Family Court, Nassau County (their docket No. V1059/92) and subsequently transferred to this court by order of Judge Feiden dated July 28,1992 for joint trial with V4576/92 under our docket No. V5703/92, petitioner John Doe, the maternal grandfather of Paul Jones born November 16, 1990 to respondents Karen and Tom Jones, seeks visitation with his grandchild. 18B Attorney John Macklin was appointed Law Guardian for the two children. All the parents object to visitation. A joint trial was held on the preliminary issue of whether the circumstances underlying the respective applications by the maternal grandfather are such that equity would see fit to intervene warranting this court’s entertaining the petitions as instructed by the holding in Matter of Emanuel S. v Joseph E. (78 NY2d 178 [1991]). In said case the Court of Appeals observed in pertinent part: "Thus, a petition for grandparental visitation may now be entertained in two situations. Where either parent of the grandchild has died, the grandparents have an absolute right to standing. In all other circumstances, grandparents will have standing only if they can establish circumstances in which equity would see fit to intervene * * * When grandparents seek visitation under either provision the court is faced with two questions. First, it must find standing based on death or equitable circumstances which permit the court to entertain the petition. If it concludes that the grandparents have established the right to be heard, then it must determine if visitation is in the best interest of the grandchild” (supra, at 181).
As the parents of each of the two respective grandchildren are alive and, as noted, object to visitation by the maternal grandfather, the court held a hearing on the preliminary issue of standing, the first of the two questions posed by the Court of Appeals. While not articulating "bright-line” guidelines as to what constitutes "the equitable circumstances” giving rise to standing, the Court did instruct that "[standing should be conferred by the court, in its discretion, only after it has examined all the relevant facts. Although an intact family is *944 not beyond the reach of the statute, that fact and the nature and basis of the parents’ objection to visitation are among the several circumstances which should be considered by courts deciding the standing question. Also an essential part of the inquiry is the nature and extent of the grandparent-grandchild relationship”, (supra, at 182).
Petitioner and each of the two respondent mothers testified at the hearing. All three are found by the court to be generally credible, except the court finds the respondents to be more accurate historians as to the nature of the parent-child bonding as it evolved between them and their father over their childhood years and into young adulthood. The following is found by the court as fact: petitioner married the maternal grandmother of the subject children on October 1, 1955. On January 9, 1960, respondent Karen was born of this union. On April 18, 1963, respondent Lisa was born of this marriage. A third daughter Mary was also born. In 1983 there was a brief separation between petitioner and his then wife, the mother of Karen and Lisa. In August 1984 there was a second separation which resulted in a divorce in 1986. At the time of this second and final separation, Lisa was a 21-year-old college sophomore and Karen was 24 years old. The circumstances surrounding this second separation included, inter alia, the petitioner’s going on a European vacation with his paramour which event having come to his wife’s attention prompted a telephone call to him in Europe with the advice not to return to the marital abode.
Petitioner made some endeavors to maintain contacts with his three daughters consequent upon this irreparable separation, but these preliminary overtures were all rebuffed by the three grown children. There was no personal contact between petitioner and his daughter Karen from at least August 1984, until the instant litigation ensued, a period of some eight years. His only personal contacts with his daughter Lisa during this same period occurred on two separate occasions. Apparently in the fall of 1986 he went to the emergency room of the hospital where Lisa worked as a nurse and had her paged. She came down and they spoke briefly. The next meeting occurred in the summer of 1988 and was prearranged at the request of petitioner. Since that meeting, there has been no personal contact between petitioner and his daughter Lisa until the instant proceedings were commenced. Petitioner’s attempts to contact Lisa after the 1988 meetings were unsuccessful and rebuffed. In 1991, petitioner found out from *945 relatives that his daughters Karen and Lisa were married and that each had a child. This prompted his writing a letter dated December 21, 1991 to his "dearest daughters” in which he advanced his view of why his marriage to their mother failed and advising in general terms what he did for them. It is basically a missive of self-justification, casting the ex-wife (respondent Karen’s and Lisa’s mother) in a somewhat unfavorable light. While petitioner in this letter acknowledged that he tested her love by his infidelity and that this was wrong, he justified his action by his perception of his then wife’s refusal to help him start a new career when he lost his employment at age 56.
Respondent Lisa Smith corroborates meeting with her father, petitioner herein, for 10 minutes at the hospital where she worked in 1986. She relates that in 1988 she received a telephone call from petitioner setting up a meeting at his office. They met and went out to a restaurant for dinner. She reflected that at this encounter her father essentially cast her mother in an unfavorable light, was disinterested in her feelings and life, and advised her that he wished his fianceé, now wife, to join them so they could get acquainted. Lisa at the hearing acknowledged that this was her first meeting with her father in some two years; that she got disgusted and left. Lisa declares that she has given her father ample opportunity to develop a relationship with her. She denies being influenced against her father by her mother. In a pithy statement she declares that her father "did not know her.” While recognizing that her father was a good provider for the family until the breakup of the family in August 1984, Lisa describes him as being supercritical of her, that she was basically afraid of him, that the final breakup in 1984 occasioned her relief and at that time she had no relationship with her father.
Respondent Karen Jones after graduation from college became employed as a full-time teacher. She similarly intoned that at the August 1984 separation she was relieved that her father would not be coming home and she would no longer have to put up with his criticism and harassment of her. She cited as examples underlying their estrangement his continuously coming home from work with a hostile attitude while she was a child, verbally abusing her; refusing to take her to her high school graduation because of an altercation the evening before. Both daughters testified that petitioner did not contribute to the college education of any of his three daughters. Karen declares that she opposes her father having visita *946 tion with her child because he took away her self-esteem and identity and she does not want to see this repeated with her son. While expressing that she is not acting out of revenge or a desire "to get even”, Karen expressed her opposition to visitation most strongly, stating that if the court imposed visitation upon her and her husband, she would opt to have no more children. It is patent on this record that both daughters have a profound mistrust of their father.
The record discloses that petitioner during the period of his marriage to the maternal grandmother of the subject children and during the minority of his children was very active in community affairs. The record also contains accounts and inferences that the home life suffered at the expense of the public life with its social activities and obligations. The maternal grandmother apparently due to her physical condition, e.g., allergy to smoke, did not attend these social events. While there were ruminations at trial by the petitioner that the maternal grandmother is responsible for his estrangement from his children, these reflections have no support in the trial record. At trial there was an offer of proof that the third daughter Mary, if called as a witness would give testimony cumulative to the testimony of Lisa and Karen. In rebuttal, petitioner denied being supercritical of his daughters.
What the court is confronted with on this record is a tragedy in human interpersonal relationships which is basically beyond purview of the law. The court cannot legislate love and the repair of a broken parent-child relationship between adults. Petitioner’s relationship with his daughters may not be characterized as simple animosity. Rather there is a total estrangement between petitioner and the respondent daughters of many years’ duration commencing in the latter’s minority and continuing into adulthood.
There is no preexisting grandparent-grandchild relationship between petitioner and the subject grandchildren. Consideration of this fact together with the fact that the court has before it two intact families wherein all four parents are opposed to visitation and the basis of the parent’s objections to visitation emanating from the total estrangement of the petitioner and his own children, the mothers of the subject grandchildren, mandates the conclusion that circumstances do not exist whereby " 'equity would see fit to intervene’.” (Mat *947 ter of Emanuel S. v Joseph E., 78 NY2d 178, 182, supra.)[2] The court finds that petitioner lacks standing since equitable circumstances are not found which would permit this court to entertain the petitions. Accordingly the petitions are dismissed for the reasons stated above.
In conclusion, the court also notes the following: The record is redolent with the suggestion that in confronting intact families on the issue of grandparent visitation circumstances may readily disclose a certain pale, but distinct glimmering beyond which the court should not venture. Indeed it is this very glimmering which may have given pause to the appellate courts in Matter of Emanuel S. v Joseph E. (78 NY2d 178, supra). At both the Appellate Division and the Court of Appeals the parents in that case argued that Domestic Relations Law § 72, the statutory authority for an award of grandparent visitation, constitutes, if applied to an intact functioning family, an unconstitutional invasion of the parents’ Federally protected right of privacy concerning the manner in which they chose to raise their children. The Appellate Division avoided confronting this issue by holding in effect that the statute does not apply to an intact nuclear family where there is no abdication of parental responsibility or interference with a "derivative” right (Matter of Emanuel S. v Joseph E., 161 AD2d 83 [2d Dept 1990]). The Court of Appeals reversed the Appellate Division holding that Domestic Relations Law § 72 does apply to an intact nuclear family regardless of "some void in the nuclear family created by death, divorce or similar disability or by forfeiture resulting from neglect” (78 NY2d 178, 182 [1991], supra). While enunciating a preliminary hearing on standing under the "equitable circumstances” (at 182) tenet of the statute, the Court of Appeals regarding the constitutional application argument of the parents noted that the parents "contend also that their constitutional rights are violated if the court allows visitation over their wishes when there is no claim that they are separated or unfit. The question is not before us. We are not addressing an award of visitation, but only whether petitioner has standing to seek it” (supra, at 183).
*948 Obviously in a situation where a court appropriately determines that there is standing by a grandparent to seek visitation with a grandchild over the parental objections in an intact nuclear family and the issue of unconstitutional application of Domestic Relations Law § 72 to such family is raised, the court will have to confront this issue. A determination of this issue adverse to the grandparent will render the standing issue academic insofar as intact nuclear families are concerned. Accordingly the holding of Matter of Emanuel S. v Joseph E. (supra) is limited to the standing issue and not dispositive of the overriding issue of the statute’s application in the constitutional sense to an intact, properly functioning family.

. "Equity has * * * been defined as the application of the dictates of conscience or the principles of natural justice to the settlement of controversies * * * Equity in its broadest and most general signification denotes the spirit and the habit of fairness, justness and right dealing which would regulate the intercourse of men with men, the rule of doing to all others as we desire they should do to us” (55 NY Jur 2d, Equity, § 1).